UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                        CR06-26 JNE/FLN

                    Plaintiff,

vs.                                                              **REPORT AND**
                                                                 **RECOMMENDATION**

Veronica Matus Garcia,

                    Defendant.

---

APPEARANCES:     Larry E. Reed, Esq., for Veronica Defendant
                 Christian Walton, Esq. for the United States

---

**THIS MATTER** came before the undersigned United States Magistrate Judge for a hearing on

April 19, 2006, on Defendant's motion to suppress or alternatively for a *Franks*' hearing [#43]. Brian

Stroshane, an officer of the Oakdale Minnesota Police Department and a member of the U.S. Drug

Enforcement Administration Task Force, who was the affiant on the search warrant, was present and

testified. Two exhibits were introduced: Stroshane's application for a search warrant and search warrant

dated January 24, 2006 (Gov't Exh. 1) and a series of investigation reports completed by special agents

in the U.S. Drug Enforcement Administration between August 2, 2005, and October 26, 2005 (Def.Exh.

1).  A third-party, Anthony Montes also briefly testified.

## I.     FINDINGS OF FACT

### A.     The Affiant's Description of Controlled Buys of Crystal Methamphetamine from Defendant

Beginning in June last year, Officer Stroshane worked with a Confidential Reliable Informant

("CRI") who provided him with information about alleged drug distribution activities of the Defendant

Veronica Matus Garcia, and another person, Anthony Montes. *See* Gov't Exh.1 at 2.  Police corroborated

the CRI's information by investigation and surveillance which included five controlled purchases of crystal methamphetamine from Defendant between June 2005 and October 2005. *Id.*

The affidavit in support of the search warrant describes five controlled purchases of crystal methamphetamine from Defendant inside her home between June 2005 and October 2005. *See generally* Gov't Exh. 1. The circumstances of these purchases are briefly described here:

1. June 14, 2005 Purchase

After being wired with a listening device and being frisked for illegal substances, the CRI, under the control and surveillance of Officer Stroshane, went to Defendant's home at ****REDACTED****in Oakdale, Minnesota and purchased 1.3 grams of suspected methamphetamine from Defendant. Police monitored the listening device they had placed on the CRI prior to the purchase. Immediately after the purchase, the CRI gave the suspected methamphetamine to Stroshane.

2. June 30, 2005 Purchase

Under the same circumstances as the June 14, 2005 purchase, the CRI made a controlled purchase of approximately 35.77 grams of suspected crystal methamphetamine for $450.00 from Defendant at her home. Agent Murphy took control and custody of the suspected crystal methamphetamine. *See* Gov't Exh.1 at 3.[1]

3. August 2, 2005 Purchase

Under the same circumstances as the two previous purchases, the CRI made a controlled purchase of approximately 48.19 grams of suspected crystal methamphetamine for $1200.00 from Defendant at her home. *See* Gov't Exh. 1 at 3-4.

4. August 11, 2005 Purchase of 78.75 grams of crystal methamphetamine.

---

[1]The pages of the exhibits are not enumerated. Page numbers are provided as pages appear sequentially.

Special Agent Murphy made this controlled purchase after Officer Stroshane introduced him to the CRI who, in turn, introduced Murphy to Defendant. Murphy made the purchase at Defendant's home, just as the CRI had previously. After Defendant let Murphy into her home, the two went to an upstairs bedroom. Murphy and Defendant discussed the terms of the purchase, i.e, the amount and the price. Murphy saw Defendant go into a closet in the bedroom and retrieve two clear plastic bags that each contained suspected crystal methamphetamine. The Defendant took $2000 from Murphy.

5. October 25, 2005 Purchase of 82.0 grams of crystal methamphetamine.

According to the affidavit, Defendant called Murphy on October 25, 2005, to arrange the purchase of two ounces of crystal methamphetamine for $2200. Murphy first met with Stroshane and another officer who fitted Murphy with an electronic listening device. Murphy then went alone to Defendant's home where he was met by Defendant at the door. Once inside, Murphy observed Defendant talk on her phone several times with her "source of supply." *See* Gov't Exh. 1 at 4. Murphy also spoke to "source of supply" who told Murphy that his cousin was on his way with two ounces of crystal methamphetamine.

Meanwhile, the officer monitoring the listening device on Murphy told Stroshane that he heard Murphy asking Defendant about a motorcycle in her garage. Murphy later told Stroshane that Defendant told him she was keeping the motorcycle as collateral for a debt of $15,000 for a pound of crystal methamphetamine. *See* Gov't Exh. 1 at 5.

Stroshane and the other officers then saw a white Ford Explorer pull into Defendant's garage. Police saw a Hispanic male get out of the truck and go into Defendant's home. According to what Murphy later told Stroshane, once inside the house, the Hispanic male, ("later identified by Murphy as Anthony Montes"), met with Murphy and Defendant. Murphy saw the Hispanic male, now identified as "Anthony Montes" in the affidavit, pull out a clear sandwich bag containing glass shards from his front pocket. Defendant took the bag from him and then gave it to Murphy. Murphy followed Defendant into the kitchen and gave her $2200. Murphy saw Defendant counted out $1700 and give it to "Montes" and put the remaining $500 in pocket. *See* Gov't Exh. 1 at 5.

These descriptions of the five controlled buys of crystal methamphetamine track very closely with the descriptions in the police reports with the exception of the June 14, 2005 buy for which there is no corresponding police report. *See generally*, Def.'s Exh. 1.

**B.     The Affiant's Description of Defendant's Activities After the Controlled Buys**

Stroshane's affidavit states that police surveillance of Defendant's home at ****REDACTED****continued from October 25, 2005, through January 24, 2006. *See* Gov't Exh.1 at 5. According to the affidavit, throughout this time, police saw the vehicle they believed that Anthony Montes drove "routinely" parked at Defendant's home. *Id*. at 5-6. On November 28, 2005, the CRI told Stroshane that he had been at Defendant's home on November 27, 2005, and had seen Montes there with "a large amount of methamphetamine in a clear plastic bag." *See* Gov't Exh. 1 at 6.  The affidavit also states that on January 13, 2006, Stroshane and Murphy met with the CRI and the CRI told them that Defendant and Montes were still both living at ****REDACTED****N. and were still distributing methamphetamine. *See* Gov't Exh. 1 at 6. After confirming with the manager of the property company that rented the Defendant's town home to her that she was still renting there and after seeing Montes' vehicle in the driveway, Officer Stroshane made an application for a search warrant.  *See* Gov't Exh. 1 at 6.

## C.   Statements in the Affidavit Regarding "Montes"

### 1.  Montes' presence at controlled buys

During his testimony on April 19, 2006, Officer Stroshane admitted that the statements in his affidavit that identify the Hispanic male who delivered two ounces of suspected crystal methamphetamine to Defendant's house as "Anthony Montes" are not true. Stroshane explained that the mistakes in his affidavit about Anthony Montes were the result of facts and circumstances that led police to assume that the two Hispanic men with similar physical appearance who they  had observed at separate times at Defendant's home were the same person.

More specifically, Stroshane explained that the CRI had told him at the beginning of the police investigation that Defendant's boyfriend was named "Tony." Next, police learned that the vehicle that they frequently saw at Defendant's home was owned by a person with a brother named "Anthony Montes." Police learned this because they ran a license plate check on the vehicle and then through further investigation, discovered that the vehicle's owner had a brother named "Anthony Montes." When police ran a driver's license search on "Anthony Montes," the photograph of the person on the driver's license issued to "Anthony Montes" looked like the Hispanic male that police had seen at Defendant's home.

Thus, according to Stroshane, because of these investigative facts, when Special Agent Murphy told him that it was "Anthony Montes" who had delivered the drugs to Defendant on October 25, 2005, Stroshane assumed Agent Murphy's identification was correct. Agent Murphy's identification was consistent with what Stroshane had observed already that day: a Hispanic male who police had seen frequently at Defendant's home and who they had already thought was "Anthony Montes" (based upon his likeness to the driver's license photograph of Anthony Montes), drove an SUV into Defendant's garage on October 25, 2005, and went inside.

Stroshane's other statements in the affidavit about Montes, i.e., the November 28, 2005 statement that the CRI had observed "Montes" at Defendant's home on November 27, 2005, and the statement on January 13, 2006, that Defendant and "Montes" were still living at ****REDACTED****in Oakdale and still distributing illegal drugs, were both based upon information provided by the CRI who described the person as "Tony." Because Stroshane had been assuming for several months that "Tony" was "Anthony Montes," Stroshane used the latter name in the affidavit.

### 3. The Police Realize their mistake

When the police arrested Defendant and Anthony Montes on January 26, 2006, Agent Murphy was present. Police asked Montes to put on a hooded sweatshirt like the one the man was wearing who supplied the 2 ounce bag of methamphetamine to Defendant on October 25, 2006. Murphy told the other officers that he was not the man involved in the drug purchase at Defendant's house on October 25, 2006. Police later dropped the charges against Montes.

At the hearing on April 19, 2006, Anthony Montes briefly testified. He admitted that he had dated Defendant during the relevant period and had sometimes spent the night at her home. He admitted to using his brother's vehicle when visiting the Defendant. He denied living with the Defendant or ever having been present during the sale of illegal substances.

## II.  LEGAL ANALYSIS

### A.  The Franks' Analysis

In order to prevail on a challenge to a warrant affidavit under *Franks,* a defendant must make a substantial preliminary showing that: (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the affidavit, and (2) the allegedly false statement is necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 154-55, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Humphreys*, 982 F.2d 254, 258 n.2 (8th Cir. 1992) (citing *United States v. Lueth),* 807 F.2d 719, 726 (8th Cir. 1986). Allegations of deliberate falsehood or reckless disregard must be accompanied by an offer of proof. *Franks,* 438 S.Ct. at 156. A negligent mistake does not rise to the level of a *Franks* violation. *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995).

The substantiality requirement for a *Franks*' hearing is not lightly met. *E.g., United States v. Crook*, 936 F.2d 1012, 1014 (8th Cir. 1991). Even where defendants have clearly identified the allegedly false portions of the warrant affidavit and provided affidavits as to their falsity, this court has upheld the denial of a *Franks*' hearing where the defendant has failed to offer proof of the affiant's recklessness or deliberate falsehood. *Id.* (citing *U.S. v. Streeter*, 907 F.2d 781, 788 (8th Cir. 1990). To determine whether an affiant had a reckless disregard for the truth, courts look to whether the affiant "in fact entertained serious doubts as to the truth of the affidavits or had obvious reasons to doubt the accuracy of the information contained therein." *United States v. Clapp*, 46 F.3d 795, 800 (citing *United States v. Dorfman*, 542 F.Supp. 345, 369 (N.D. Ill. 1982).

1.    <u>The Untrue Statements Were Not Made Intentionally</u>

The Court concludes that the inclusion of untrue statements in Stroshane's affidavit which identified Anthony Montes as the person present during the controlled purchase of two ounces of crystal methamphetamine at Defendant's residence on October 25, 2006, was a mistake. As explained below, given the facts and circumstances that created the inferences that led police to conclude that this person was Anthony Montes, the court is unable to conclude that Officer Stroshane had deliberatley lied or acted recklessly by including these mistaken statements in his affidavit.

The inference that Stroshane made – that Defendant's boyfriend named "Tony," and "Anthony Montes" and the person who drove 2 ounces of crystal methamphetamine to Defendant's house on October 25, 2005 were all the same person – was not entirely unreasonable. In addition to the several facts and observations that supported drawing the inference, it is significant that the police obtained all their evidence about Anthony Montes from sources that they reasonably considered accurate. The first source,

the CRI who had already established his reliability with Stroshane prior to the investigation of Defendant, continued to demonstrate his reliability by identifying the Defendant as a drug dealer and giving Stroshane her name, address and the name of her boyfriend.  All this information was quickly corroborated by police once they began their investigation.  The second source, the state Motor Vehicle Registration was also obviously a well-established source for police.  The same was true for the state driver's license photograph for "Anthony Montes."  Finally, there was Special Agent Murphy's eyewitness identification of Anthony Montes.  This is particularly persuasive evidence that the police reasonably thought they had correctly identified the Hispanic man who was involved in selling crystal methamphetamine with Defendant.  Agent Murphy, who presumably had studied the driver's license photograph of Anthony Montes, made a positive identification of him after seeing him in very close proximity in Defendant's home.

As discussed further below, the statements about Montes are not required for the affidavit to establish probable cause.  Indeed, these statements are of little importance to the central focus of the affidavit's storyline, i.e., the continuous distribution of crystal methamphetamine by Defendant from her home with the participation of a third-party Hispanic male. Clearly, the affidavit does not rely on Defendant's association with Anthony Montes to establish probable cause that she was distributing illegal drugs from her home.  As such, there was no reason or motivation for Stroshane to have intentionally misidentified the Hispanic male as "Anthony Montes."  As there is no showing of a deliberate lie, or reckless disregard for the truth, the Defendant has not met the requirements for a *Franks*' hearing.

> 2.    The Affidavit Establishes Probable Cause Without the Inclusion of the Untrue Statements About Montes

The Supreme Court defines probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213 (1983). "Probable cause means more than bare suspicion but less than absolute certainty that the search will be fruitful." *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995), *cert. denied,* 116 S.Ct. 125. The statements of a reliable confidential informant may be sufficient to support probable cause. *United States v. Wright*, 145 F.3d 972, 974-75 (8th Cir. 1998). Corroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause. *United States v. Fomaro*, 152 F.3d 768, 770 (8th Cir. 1998) (citing *U.S. v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996).

Even if Defendant were able to satisfy the first prong of the *Franks*' test and the untrue statements regarding Anthony Montes are deleted from the affidavit, more than sufficient content remains to establish probable cause. Police made five controlled purchases of crystal methamphetamine from Defendant, the last four of which involved large amounts of methamphetamine. In all but one instance, Defendant sold methamphetamine that she had stored in her home. Additionally, in all but that one instance, the CRI or Agent Murphy completed the purchases of methamphetamine directly with Defendant and *only* with Defendant present during the transaction. During the fifth purchase, Defendant orchestrated the transaction by calling Murphy and telling him she could sell him 2 ounces, by arranging for the source to have 2 ounces delivered to her house, and taking the methamphetamine from the source's deliveryman and handing it to Murphy in exchange for $2200 from Murphy.

These controlled purchases during the four months between mid-June 2005 and the end of October 2005, is strong evidence of Defendant's significant and continuous involvement in the sale and distribution

of crystal methamphetamine from her home. *See Formaro*, 152 F.3d at 770-771 (affidavit describing multiple controlled purchases of illegal drugs from Defendant by CRI supported the inference that the Defendant was more than a one-time drug seller)(citing *United States v. Pitts*, 6 F.3d 1366, 1370 (9th Cir. 1993). In other words, the police undoubtedly had probable cause to believe that illegal drugs and evidence of distribution of illegal drugs would be found during a search of Defendant's home. As the 8th Circuit has observed, "few places are more convenient than one's residence for use in planning criminal activity and concealing the fruits of a crime." *United States v. Hulett*, 22 F.3d 779, 780-81 (8th Cir. 1994), *cert. denied*, 512 U.S. 882 (1994). Indeed here, Defendant Garcia led Agent Murphy up to her bedroom where he observed her retrieve a 2 ounce bag of crystal methamphetamine that she had hidden somewhere in a closet. *See* Gov't Exh. 1 at 4. Given the strength of this evidence, the court finds that police had probable cause to conduct a search of Defendant's home.

### 3.    The Evidence Establishing Probable Cause Was Not Stale

Finally, Defendant challenges the search warrant on the basis of staleness. Defendant points out that the last controlled buy occurred on October 25, 2005, and that the application for the search warrant describing the controlled buys was not made until January 24, 2006.

It is true that probable cause must exist when a warrant is issued, not merely at some earlier time. *LaMorie*, 100 F.3d at 554. However, there is no bright-line test in determining when information is stale, and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. *Id.* (citing *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993)). Time factors must be examined in the context of a specific case and

the nature of the crime under investigation.  *Id* (citing *Koelling*, 992 F.2d at 822).   Where continuing

criminal activity is suspected, the passage of time is less significant.  *Id*.

There is strong precedent for the conclusion that with respect to drug trafficking, probable cause

may exist for weeks, if not months after the last observed criminal activity.  *E.g., United States v. Ortiz*,

143 F.3d 728, 732-33 (2d Cir. 1998) ("in investigations of ongoing narcotics operations, 'intervals of

weeks or months between the last described act and the application for the warrant did not necessarily

make the information stale"); *see also United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1994) ("'With

respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last

reported instance of suspect activity'.") (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399

(9th Cir. 1986).

The affidavit did not rest on stale evidence.  Police had established that at least from June to

October 2005, Defendant was selling large amounts of crystal methamphetamine from her home and had

no reason to believe she had stopped.  On January 13, 2006, just 11 days before Officer Stroshane

completed his search warrant affidavit, The CRI told him that Defendant and her boyfriend were still

distributing illegal drugs from ****REDACTED**** in Oakdale.  In *Illinois v. Gates*, the Court noted that

in the case of an informant who "is known for his unusual reliability in predicting certain types of criminal

activities in a locality," the fact that the informant  may not have explained to police the basis for his

knowledge is not a bar to a finding of probable cause.  *Id*. at 462 U.S. 213, 233, 103 S.Ct. 2317, 2329-

30 (1983).  Stroshane's statement that he had known the CRI to be reliable in the past and the strong

evidence in the affidavit demonstrating the CRI's reliability with regard to his knowledge about Defendant's

illegal activities, was sufficient to establish the requisite justification for Stroshane's reliance on the CRI's

information in January 2006, even if the CRI did not provide the basis of this information to Stroshane. Additionally, this information from the CRI was consistent with the continued observation by police of the presence of the vehicle driven by Defendant's boyfriend at Defendant's home.

Accordingly, given the duration over which police observed and confirmed that Defendant was distributing methamphetamine from her home and the fresh circumstantial evidence obtained in mid-January 2006, that she was continuing to distribute, police had probable cause to suspect that illegal drugs and evidence of distribution of illegal drugs would be found in Defendant's home January 24, 2006, the day the affidavit was signed and on January 26, 2006, when the search occurred.

## III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that Defendant's motion to suppress or alternatively for a *Franks*' hearing [#43]

be **DENIED**.

Dated:  May 18, 2006                                      _s/ Franklin L. Noel_
                                                          FRANKLIN L. NOEL
                                                          United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 31, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 31, 2006** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.